NO. 95-551

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

EDWARD KILLOY, JR,

      Petitioner and Appellant,

  v.

RELIANCE NATIONAL INDEMNITY,

      Respondent and Insurer for,

RHONE-POULENC BASIC CHEMICAL CO.,

      Employer and Respondent.

FILED

SEP 03 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court
             State of Montana
             The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Bernard J. Everett, Knight, Dahood, McLean &
          Everett, Anaconda, Montana

      For Respondent:

          Brendon J. Rohan, Butte, Montana

Submitted on Briefs: April 11, 1996

Decided: September 3, 1996

Filed:

_____
Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Appellant, Edward Killoy, Jr. (claimant), appeals the Workers' Compensation Court's order concluding that he was not permanently totally disabled and, therefore was not entitled to permanent total disability benefits as a result of his work-related injury.

We reverse and remand.

Appellant raises the following issues for review, which we restate as follows:

1. Did the Workers' Compensation Court err in finding that claimant had a reasonable prospect of being able to tolerate his pain and physically perform at regular employment?

2. Did the Workers' Compensation Court err in failing to award claimant attorney's fees and costs pursuant to §§ 39-71-611 and 39-71-2907, MCA?

### FACTS

At the time of trial, claimant was 58 years old. He did not graduate from high school but did obtain a GED while in the Navy. Claimant has worked since 1962 as a heavy-duty mechanic for various employers. He went to work full-time for Rhone-Poulenc Basic Chemicals in 1991.

Claimant was injured in the course and scope of his employment on August 20, 1993, when a heavy shaker screen fell on his head and jammed his neck. At the time of the injury, Rhone-Poulenc was insured by Reliance National Indemnity (Reliance). Reliance accepted liability for claimant's injury and has paid out his medical benefits, as well as temporary total disability benefits.

Following his injury, claimant was initially examined by Dr. Knutsen. X-rays showed "[d]egenerative disc changes, spurring, and some narrowing of the lower foramina." Dr. Knutsen prescribed physical therapy and medication, and directed that claimant be placed on light-duty.

On August 27, 1993, claimant told Dr. Knutsen that the light-duty work was aggravating his neck. Dr. Knutsen advised him to take a full week off. He continued to treat claimant conservatively, prescribing bed rest, physical therapy, cervical traction, and medication. After his condition deteriorated, claimant was referred to Dr. Dewey for a second opinion.

Following an examination on October 14, 1993, Dr. Dewey determined that claimant suffered from "significant cervical canal stenosis at L4-5, 5-6, and 6-7 [sic]. There is degenerative disease at these levels, some neuroforaminal encroachment." All parties agree that the reference to the lumbar disc, however, appears to be in error, and should refer to the cervical level. Dr. Dewey examined claimant again on November 9, 1993, at which time he reported that claimant was much improved and felt that decompression surgery was unwarranted. Dr. Dewey advised claimant to continue his stretching exercises and to return for a examination the following year to determine whether his spinal stenosis was progressing.

By November 16, 1993, both Dr. Knutsen and Dr. Dewey had released claimant to work full-time. Dr. Knutsen cautioned claimant to avoid any trauma to or hyperextension of his neck.

Claimant returned to work, but experienced increasing pain. Dr. Knutsen took claimant back off of work on December 14, 1993, until his condition improved. Claimant returned again on January 3, 1994.

On February 18, 1994, Claimant was pulling on a cable at work when the cable slipped and hit him in the face. This incident resulted in a violent jolting of his head which aggravated claimant's original injury. After this, claimant felt he could no longer perform at his heavy labor position. Dr. Knutsen agreed but again sent claimant to Dr. Dewey for a second opinion.

On March 14, 1994, Dr. Dewey wrote Dr. Knutsen a report regarding his examination of claimant. Dr. Dewey noted muscular symptoms in claimant's neck, shoulder area, and at the base of his skull. He recommended a month of very aggressive stretching, supplemented by deep heat, ultrasound, and massage by a physical therapist. Dr. Dewey was unable to state whether claimant would be able to return to his time-of-injury job.

Dr. Dewey saw claimant again on April 18, 1994. Claimant's condition had not improved, and Dr. Dewey concluded that claimant could not return to his time-of-injury position. Dr. Dewey identified several problems:

> Cervical spondylosis; radiculopathy not identified; cervical stenosis, possible but not proven cervical radiculopathy; bilateral ulnar entrapment neuropathies; significant cervical myospasm. . .

At this point, Dr. Dewey did not feel that claimant would get any better, he noted that claimant's condition may in fact worsen over time.

Both at trial and by deposition, claimant testified that he experiences constant pain from the base of the skull, down the middle of the back through his shoulders. He has headaches and muscle spasms. Claimant's level of pain is aggravated both by increased activity as well as by remaining stationary for any length of time. Claimant finds temporary relief from pain by using a stretching apparatus for his neck and performing stretching exercises on a daily basis. On "bad" days, he seeks relief through hot showers and a heating pad. Claimant has not worked since he re-aggravated his injury in February 1994.

In August 1993, Rhone-Poulenc retained a certified rehabilitation counselor to perform medical case management services relative to claimant's injury. The counselor, Patricia Hink, submitted a preliminary report in which she encouraged claimant to apply for social security benefits which he subsequently applied for and received. Later, Hink identified several jobs as possibly suitable for claimant and submitted job analyses to Dr. Dewey for review. Dr. Dewey approved of four of the positions, stating that if a patient such as claimant had expressed a desire to try one of these positions, that, in his opinion, these positions could be "safely attempted" without risk. Dr. Dewey, however, did not offer his opinion as to whether

5

claimant was capable of doing these positions, stating instead that only the patient was able to answer that question.

Based on Hink's "Employability Assessment Report," the insurer converted claimant's benefits from temporary total disability to permanent partial disability on May 27, 1995. On June 9, 1995, claimant petitioned the Workers' Compensation Court for a hearing. After the hearing in August 1995, the Workers' Compensation Court found that claimant's testimony regarding his pain was credible. However, the court was not persuaded that his pain would necessarily preclude claimant from working. The court then concluded that Rhone-Poulenc had met its burden of establishing that claimant had a reasonable prospect of "physically performing regular employment." The Workers' Compensation Court concluded that claimant was not permanently totally disabled and, therefore was not entitled to corresponding benefits.

Claimant appeals from that decision.

### DISCUSSION

Did the Workers' Compensation Court err in finding that claimant had a reasonable prospect of being able to tolerate his pain and physically perform at regular employment?

Decisions of the Workers' Compensation Court must be based on substantial credible evidence. O'Brien v. Central Feeds (1990), 241 Mont. 267, 271, 786 P.2d 1169, 1172. The court's findings of fact will be upheld if they are supported by substantial credible evidence. Wunderlich v. Lumbermens Mutual Casualty Co. (1995), 270 Mont. 404, 408, 892 P.3d 563, 566.

The law in effect at the time of the injury governs the claimant's entitlement to benefits. *Buckman v. Montana Deaconess Hospital* (1986), 224 Mont. 318, 321, 730 P.2d 380, 382. Claimant was injured on August 20, 1993, therefore, the 1993 version of the Workers' Compensation Act governs this case. The claimant bears the burden of proving he or she was permanently totally disabled. *Dumont v. Wickens* (1979), 183 Mont. 190, 201, 598 P.2d 1099, 1105.

The definition of permanent total disability reads as follows:

> "Permanent total disability" means a condition resulting from injury as defined in this chapter, after a worker reaches maximum medical healing in which a worker does not have **a reasonable prospect of physically performing regular employment.** Regular employment means work on a recurring basis performed for remuneration in a trade, business, profession, or other occupation in this state. Lack of immediate job openings is not a factor to be considered in determining if a worker is permanently totally disabled.

Section 39-71-116(13), MCA (1993) (emphasis added).

In its decision, the Workers' Compensation Court found that appropriate jobs existed for claimant. The rehabilitation counselor, Hink, identified several jobs as possibly suitable for regular employment: lubrication technician, sewer (sewing backpacks), shoe repair person, cashier, motel clerk, lumber salesperson, and meter reader. Of these positions, the Workers' Compensation Court narrowed the list, and determined that claimant was physically capable of performing as either a motel clerk or a cashier.

At trial, claimant disputed his ability to perform any of the suggested positions. According to his testimony, his pain makes

7

him uncontrollably unpleasant.   Claimant specifically contended that because of his pain it would be difficult for him to be confined to the limited space provided to a cashier, or to carry luggage if employed as a motel clerk.

The Workers' Compensation Court did not dispute that claimant was in pain and that activity increased his pain, rather the court was not convinced that this would prevent him from working. Instead, the court found claimant to be a positive and up-beat person who had "worked all his life and has a good work ethic, and [the court] was persuaded [that claimant] would cope with his pain if he was forced to do so."   Ultimately, the court found that claimant had a reasonable opportunity for regular employment.

On appeal, claimant argues that the Workers' Compensation Court erred in this finding.  Claimant asserts that it is the law in Montana that pain can be considered when determining whether a claimant is permanently totally disabled.    Robins v. Anaconda Aluminum Co. (1978), 175 Mont. 514, 521-22, 575 P.2d 67, 72 and Jensen v. Zook Brothers Construction Co. (1978), 178 Mont. 59, 63, 582 P.2d 1191, 1193.

In Robins, the claimant fractured his skull and other bones after falling 16 to 18 feet.  He returned to work, then fell a second time and injured his back.  There, one doctor stated that the claimant could work, if he could endure the pain.  The other doctor testified that the claimant could not work because he could not take the pain.  In affirming the lower court, this Court held

that pain must be considered as a factor when determining disability. Robins, 575 P.2d at 71.

In Jensen, the claimant crushed his dominant hand. The claimant testified that he had pain up his arm into his elbow. Following Robins, this Court held that the evidence showing that the claimant could not work without pain or endure pain while working constitutes substantial evidence supporting a finding of permanent disability. Jensen, 582 P.2d at 1193.

In its decision, the Workers' Compensation Court considered both Jensen and Robins, nevertheless, the court determined that under recent revisions to the permanent total disability statute, pain is only one factor to be considered when determining a claimant's disability. Metzger v. Chemetron Co. (1984), 212 Mont. 351, 354, 687 P.2d 1033, 1035. Under 1993 revisions to the definition of permanent total disability, the court noted that the claimant must prove that he or she has "no reasonable prospect of physically performing regular employment." Section 39-71-116 (13), MCA.

This Court agrees with the Workers' Compensation Court's conclusion that pain is only one factor to be considered when reaching a determination of disability. As was also aptly pointed out by the court in this case, "Pain. . may be so severe for some individuals that it renders them physically incapable of performing their job duties. . . ."

In its order, the Workers' Compensation Court relies on the "medical evidence concerning permanent total disability." This

9

medical evidence, the court states, was provided by Dr. Dewey, "who approved of five positions." The court concluded further, that Dr. Dewey's testimony did not support claimant's claim for disability. However, where medical testimony is offered by deposition, this Court is in as good a position as the Workers' Compensation Court to determine its weight. Caekaert v. State Comp. Ins. Fund (1994), 268 Mont. 105, 110, 885 P.2d 495, 498. Although Dr. Dewey did approve of several of the suggested positions, this was not the extent of the medical testimony

In his deposition, Dr. Dewey specifically qualified his approval and made no determination concerning claimant's ability to cope with pain. At trial, the court pointed this out:

> THE COURT:. . . [Dr. Dewey] basically said medically [claimant's] not going to be at risk. In other words, he's not at risk with further injuring himself in these jobs, but whether or not he performs them is really up to him.

Dr. Dewey testified that claimant could safely attempt the jobs without risk, his opinion does not support a finding that claimant was physically capable of performing regular employment.

Furthermore, Dr. Dewey testified that he considered claimant's response to his neck injury as "appropriate." Accordingly, Dr. Dewey testified that he would defer to claimant regarding his ability to tolerate the pain associated with a suggested position. Therefore, according to the medical opinion of Dr. Dewey, the claimant in this case stands in the best position to judge his abilities

10

Other medical evidence was provided through the records of Dr. Knutsen. Throughout his records, Dr. Knutsen notes that claimant experienced chronic neck pain. Following claimant's re-aggravation in February, Dr. Knutsen noted that he did not think claimant would be able to return to his regular job. In a letter to the insurer, Dr. Knutsen wrote that "[s]ometimes the slightest little neck jolt or bump on the head will markedly aggravate his chronic neck pains."

Following Jensen and -Robins, this Court must consider the evidence regarding claimant's pain when reviewing the Workers' Compensation Court's determination of disability. In this case, the medical evidence does not support the court's finding that claimant was capable of working without pain or that he was capable of enduring his pain while working. See Jensen, 582 P.2d at 1192.

We conclude that the record does not contain substantial credible evidence supporting a finding that claimant has a reasonable prospect of physically performing regular employment. In this matter, not only did Dr. Dewey testify that he considered claimant's response to his injury as appropriate, the court also found that "[claimant's] . testimony regarding his pain was credible." Considering this, both at trial and in his deposition, claimant testified that he experiences constant pain from the base of the skull, down the middle of the back through his shoulders. He described headaches and muscle spasms. His level of pain increases if he engages in any increased activity or if he is

11

stationary for any length of time.  On "bad" days, he seeks relief through hot showers and uses a heating pad.

It is evident from this testimony that claimant's pain would prevent him from holding down regular employment.  This Court has held that a trial court may not disregard uncontradicted credible evidence.  Burns v. Plum Creek Timber (1994), 268 Mont. 82, 85, 885 P.2d 508, 510 (citing McGuire v. American Honda Co. (1977), 173 Mont. 171, 566 P.2d 1124.)

In its order denying claimant's motion for rehearing, the court raises concerns that because pain is subjective, claimants would unilaterally determine that they cannot work.  That may or may not be the case but that is not the situation here.  Claimant's testimony was corroborated by medical evidence offered by both Dr. Dewey and Dr. Knutsen.  Furthermore, claimant's testimony regarding his pain was found to be credible by both Dr. Dewey and the court.

In summary, we conclude that uncontroverted testimony presented at trial supports a finding that claimant is unable to perform at any of the suggested positions without experiencing substantial pain.  Furthermore, we conclude that the Workers' Compensation Court erred in concluding that claimant is capable of tolerating his pain and physically performing at regular employment.

Having concluded the claimant is entitled to benefits, we remand this case for a determination of attorney's fees and costs pursuant to §§ 39-71-611 and 39-71-2907, MCA.

Reversed and remanded.

_____
Justice

12

We Concur:

_____
Chief Justice

_____

_____
Justices

13

Justice Terry N. Trieweiler specially concurring.

I concur with the majority opinion. However, I write in response to the dissent.

In my opinion it is the dissent which misapplies the standard of review in this case and the author of that opinion who has refused to follow the correct standard of review in the past.

In this case, the only medical evidence was the written reports, which were admitted as exhibits without objection, and the transcribed deposition testimony of Richard C. Dewey, M.D. We have repeatedly held, for obvious reasons, that where medical evidence is submitted by deposition, this Court is in as good a position to evaluate that evidence as the trial court. *Larson v. Cigna* Ins. *Co.* (Mont. 1996), 915 P.2d 863, 53 St. Rep. 3 *94*; *Weber v. Public Employees' Retirement Bd.* (1995), 270 Mont. 239, *890 P.2d 12 96*; *Simons v. State Comp. Mut. Ins. Fund* (1993), 262 Mont. 438, *865 P.2d 1118*; *White v. Ford, Bacon & Davis Texas, Inc.* (1992), 256 Mont. 9, 843 P.2d 787; *Schrapps v. Safeway Stores* (1989), 238 Mont. 355, 777 P.2d 887; *Roadarmel v. Acme Concrete Co.* (1989), 237 Mont. 163, 772 P.2d 1259; *Hartman v. Staley Continental* (1989), 236 Mont. 141, 768 P.2d 1380; *Hurley v. Dupuis* (1988), 233 Mont. 242, 759 P.2d 996; *Brown v. Ament* (1988), 231 Mont. 158, 752 P.2d 171; *Snyder v. San Francisco Feed & Grain* (1987), 230 Mont. 16, *748 P.2d 9 2 4*; *Lauderdale v. Montana Dep't of Agric.* (1987), 229 Mont. 188, 745 P.2d 690. *Larson v. Squire Shops, Inc.* (1987), 228 Mont. 377, 742 P.2d 1003; *Currey v. 10 Minute Lube* (1987), 226 Mont.

14

445, 736 P.2d 113; *Brewington v. Birkenbuel, Inc.*(1986),222 Mont. 505, 723 P.2d 938; *Frost v. Anaconda Co.*(1985), 216 Mont. 387, 701 P.2d 987. *Shupert v. Anaconda Aluminum* Co. (1985), 215 Mont. 182, 696 P.2d 436; *Lamb v. Missoula Imports, Inc.* (1984), 211 Mont. 360, 684 P.2d 498; *Jones v. St. Regis Paper* Co. (1981), 196 Mont. 138, 639 P.2d 1140; *Hert v. J.J. Newberry Co.* (1978), 178 Mont. 355, 584 P.2d 656.

Our oft-repeated rule regarding medical testimony by deposition makes practical sense because there is no witness demeanor for the trial court to observe, nor are there other intangible aspects to the testimony about which the trial court is exclusively aware. The problem with this standard of review is that it does place some additional responsibility on the reviewing court to independently analyze and evaluate the medical evidence offered by deposition. The author of the dissenting opinion has been reluctant to do so. *See Larson v. Cigna Ins. Co.* (Mont. 1996), 915 P.2d 863, 53 St. Rep. 394; *McIntyre v. Glen Lake Irr. Dist.* (1991), 249 Mont. 63, 813 P.2d 451. I have no similar reservations.

However, in this case, my differences with Justice Gray over the scope of our review of Workers' Compensation Court decisions where the medical evidence has been provided exclusively by deposition is not critical to our decision. Whether we review this case based on the rule that we have repeatedly articulated, or simply for substantial evidence, as the dissenters would prefer, there is absolutely no basis for upholding the Workers'

15

Compensation court's finding that Edward Killoy, Jr., is employable.

The dissent contends that Killoy offered no medical evidence that he was physically incapable of regular employment. However, that is not correct. Exhibit No. 4, admitted at the time of trial, consisted of medical records from Bruce E. Knutsen, M.D., who initially treated Killoy for his injury. The records included Dr. Knutsen's February 28, 1994, report, which was issued at the request of the insurance adjuster shortly after Killoy's aggravation of his injury. In that report he stated that:

> I suspect Mr. Killoy will be disabled from his laboring type profession as I have attempted to send him back on two different occasions. He has been able to work reasonably well, although he continues with neck pain. Sometimes the slightest little neck jolt or bump on the head will markedly aggravate his chronic neck pains.
>
> At this point, I have suggested he go back and get a second opinion from Dr. Richard Dewey who he saw previously to see if there is anything else Dr. Dewey may be able to offer him in the way of surgical correction. If not, he may be on permanent disability. I just do not think he can continue in a laboring profession.

Edward Killoy did go back to Dr. Dewey who examined him and issued a report to Dr. Knutsen regarding his observations on April 18, 1994. That report was admitted without objection at trial as Exhibit No. 1. In that report he stated:

> Edward is really unchanged. He continues to have significant muscular symptoms in the back, shoulders, base of the skull. Hands go to sleep at night although not in the ulnar distribution and he has not made any improvement. The symptoms he is having are related to the amount of heavy work that he does. It is my opinion that he could not return to his usual occupation with Rhone Poulene [sic] but could return to a lighter

16

occupation if that can be worked out.  If not, I think he should be medically retired. . .

The options are clear.  Surgery will not relieve his muscular problems and will not relieve problems related to cervical spondylosis.  These are aggravated by heavy work and lighter work is recommended.  In the absence of that, his only option is medical retirement.

He has the following problems: Cervical spondylosis, radiculopathynot identified; cervical stenosis, possible but not proven cervical radiculopathy; bilateral ulnar entrapment neuropathies; significant cervical myospasm. I do not feel he will get any better.  He may worsen as time goes on and he cannot return to his usual occupation.

In response to the recommendations of Dr. Knutsen and Dr. Dewey that the possibility of lighter work be considered, or in the alternative,  that Killoy be medically retired,  his  employer's insurer hired Patricia Hink, a vocational consultant, who reviewed Killoy's medical records, his educational and work background, and his physical limitations,  and issued a report to his employer's insurer on June 23, 1994.  The report consists of ten pages and meticulously outlines Killoy's work history, his education, his medical status, and his physical limitations.  That report **was** admitted without objection as trial Exhibit No. 3.  In  that  report, Hink  concluded:

Due to the persistent problems that Mr. Killoy has had in performing even normal daily functions, I felt that it was appropriate for him to apply for Social Security benefits.  Given his age at 57 years which makes him an older adult, a 10th grade education, and a heavy to very heavy occupation which he has performed consistently since 1956,  it would be difficult for Mr. Killoy to re-enter the work force even at unskilled jobs at this time.

. . . .

17

At the present time, Mr. Killoy remains off work and has applied for Social Security Benefits. I have encouraged him in this direction since his past relevant work has been heavy, to very heavy physical demand work. . . These skills do not easily transfer into lighter work, especially for an individual of his age, which is now 57. He has a limited formal education, however, he has obtained his GED through the Navy in 1955. Given the [severity] of the industrial injury that he has sustained and his persistent symptoms, he appears to be a favorable candidate for Social Security Benefits.

Hink's report goes on to state that Killoy had reached maximum medical improvement but that his employer had no light-duty work for him and that he was a high risk for re-injury in the work place. She pointed out that he had difficulty sitting for any length of time and difficulty sleeping, which made any employment problematic.

The combination of Dr. Knutsen's report, Dr. Dewey's report, and Patricia Hink's analysis of the medical records, as they apply to the field of vocational placement, clearly established by a preponderance of the medical evidence that Edward Killoy was unemployable. To suggest, as the dissent does, that he offered "no medical evidence that he did not have a reasonable prospect of physically performing regular employment" simply ignores the record. To suggest that the necessary quantum of medical proof requires that a doctor testify that in his or her opinion Killoy was "physically incapable of performing regular employment" confuses the function of medical evidence and vocational evidence. Doctors are not qualified to testify regarding vocational opportunities, they are merely qualified to testify regarding the nature of a patient's injury and the physical restrictions that

18

result from that injury. In this case, the medical evidence clearly established the nature of Killoy's injury, that physical limitations resulted from that injury, and that Killoy's pattern of pain was consistent with his injury.. Medical evidence can do no more. Somewhere common sense has to be applied.

The dissent argues that Dr. Dewey approved five positions for Killoy, and therefore, that the Workers' Compensation Court's opinion was supported by substantial evidence. However, the dissent's characterization of Dr. Dewey's testimony is out of context and incomplete. When specifically asked whether it was his opinion that Killoy was physically capable of performing the jobs which had been submitted to him and described for him by Patricia Hink, Dr. Dewey testified as follows:

> No, I didn't say that. I said he could. I didn't know if he was capable of doing it. I very clearly caged myself on that record. I said, "Can safely be attempted without risk."
>
> . . . But if he was capable of doing them, I can't answer that. That's a question that doctors can't answer; only the patient can answer that.
>
> I know that's not the answer you want to get. You want to get this thing absolutely black and white, but I can't give you that answer. I can tell you whether there's risk and no risk. And I can tell you that the patient should be able to perform those duties. Whether they can tolerate them or not, that's a different story.
>
> . . . .
>
> . . . I can only give you what is safe and what is unsafe.

(Emphasis added.)

The dissent criticizes the majority opinion because:

19

Dr. Dewey did <u>not</u> opine that Killoy's pain rendered him unable to perform the positions and, therefore, the Court's reliance on our ability to determine the weight of medical deposition testimony, under *Caekaert*, is totally misplaced; there is simply no medical evidence of pain too severe to permit the performance of regular employment.

The dissent apparently did not consider Dr. Dewey's testimony that neither he nor any other doctor can give the type of testimony that the dissenters would like to see. Ultimately, however, Dr. Dewey's testimony is just common sense. The state of medical science has not yet advanced to the point where it can measure the degree of an individual's pain, no matter how much the dissenters would like to reduce the evaluation process to a question of connecting the dots. For purposes of the result in this case, though, Dr. Dewey did testify that:

> His symptoms were very typical of that kind of an injury, and aggravation of -- a muscular aggravation of something which, you know, for reasons we don't quite understand, are quiet for a long time. . .
>
> . . . Whether it's the patient's tolerance or not, his symptoms are certainly consistent with everything that happened to him, and he's not alone in having this kind of problem.

In conclusion, Dr. Dewey gave the following relevant testimony, which was all the medical proof he could offer:

> Q. By approving the job descriptions that were submitted to Patricia Hink, you were recommending that he could, without risk, attempt to work in those positions; is that correct?
>
> A. That is correct. And I will read to you the paragraph which I specifically signed my name to.

20

"This job is physically compatible with this worker's physical capabilities." Doesn't say anything about his tolerance, it says about his capabilities.

Q. We're talking about tolerance, you're referring to the level of pain that he may have to -- or would incur if he attempted that?

A. For this patient, yes, that is correct.

Q. And the pain that he suffers is certainly consistent with the injury he sustained?

A. Yes.

Q. And is it consistent with his medical condition?

A. Yes

Q. And you would defer to the patient his ability to tolerate those jobs?

A. Probably, in this case, yes, because I've seen him a number of **times.** If someone came in off the street and told me they couldn't do that, I think I'd want to get a little bit better feeling for how that patient responds and whether the patient's an appropriate or inappropriate responder.

Q. Did you, in this case, feel it is appropriate?

A. Yes.

The dissent's conclusion that "Killoy's subjective view of his pain does not constitute medical evidence" is therefore directly contradicted by the only medical evidence which could be offered. Killoy's subjective view of his pain, as evaluated by his attending physician, is the best evidence of his physical limitations. To hold otherwise is to ignore the medical evidence.

Because Dr. Dewey testified that whether Killoy could work would ultimately depend on whether he could tolerate work, and because the Workers' Compensation Court found that Killoy's

21

testimony regarding the degree of his pain was credible, it is appropriate to review what he said in that regard.

He stated that he has pain from the base of his skull to the middle of his back and in both shoulders. His pain causes headaches on a continual basis. He has muscle spasms related to any physical activity. The muscle spasms occur in his neck, back, shoulders, chest, and throat. Whenever that occurs he has to change positions. If he is sitting he has to stand; if he is standing he has to sit.

The pain in Killoy's neck is constant and any kind of activity, including walking, prolonged sitting, sleeping, or standing makes the pain worse. Reaching aggravates his condition. When his pain is aggravated the severity of his headaches increases.

When Killoy does experience spasms, he has to apply cervical traction. This occurs an average of two to four times daily for up to ten minutes at a time. He also has to perform stretching exercises throughout the day.

During each week Killoy has one or two bad days where he sits in a recliner chair with a hot pad and "can't do a hell of a lot" except try to get relief. He has almost quit fishing, he has quit hunting, and he no longer exercises, although he used to be a regular participant in programs at the YMCA.

Edward Killoy, who is the best judge of his physical tolerance, did not think there was any job he could perform for

22

eight hours a day. To suggest that he can, demonstrates a total insensitivity to the requirements of regular employment.

One of the reasons Killoy has not attempted to return to employment is because, at Patricia Hink's recommendation, he applied for and received social security disability benefits, which he would lose if he attempted to return to work that he does not think he can perform. What is unreasonable about that?

The Workers' Compensation Court specifically found that:

> Claimant testified that he experiences pain from the base of the skull, down the middle of the back and through his shoulders. He described his pain as constant. He has headaches and muscle spasm, which are aggravated by increased activity. He obtains temporary pain relief by using a stretching apparatus for his neck and performing stretching exercises on a daily basis. He has his "bad days" once or twice a week. On those days, he seeks relief through hot showers and a heating pad. His level of pain increases if he is stationary for any length of time. Claimant's testimony regarding his pain was credible.

In spite of Dr. Dewey's testimony that Killoy's ability to be employed would depend on his ability to tolerate the pain, and his further testimony that Killoy's complaints of continuous pain were consistent with the nature of his injury, Patricia Hink did not even bother to submit the job descriptions on which the employer now relies to Killoy for his consideration before changing her opinion about his employability. She admitted that she did not know whether Killoy could tolerate the pain he would have to endure to perform the jobs she submitted. She did not arrange for him to attempt to perform any of those jobs. Neither did she arrange for a work-hardening program which would help him prepare to attempt

those jobs.  She did not even bother to discuss the jobs she was recommending with him.  When asked by the court whether she thought Killoy was capable of full-time work, as opposed to part-time work, she simply said, "I would hope that he would be able to work at full-time work . . . ."  However, when asked whether anyone would hire him if he explained to a potential employer all the physical limitations that he had testified to, she admitted that no one would.

The dissent characterizes the preceding summary of the evidence in this case as "bits and pieces" of the record. I disagree.  However, the important point is that in spite of a diligent search I have been unable to find any "bits and pieces" of the record which support the judgment of the Workers' Compensation Court or the dissent's strained effort to affirm that judgment.

In summary, even if this Court applies the standard of review preferred by the dissent, there was no substantial evidence that Edward Killoy was physically capable of regular employment. All of the evidence, medical and otherwise, was to the contrary.  The dissent's insistence that there be medical evidence regarding the degree of Killoy's pain ignores reality and the limitations of medical science.   The dissent's criticism of the majority's reliance on Killoy's own description of his pain ignores the fact that his attending physician testified that that was the only way in which his actual job prospects could be evaluated, and that the Workers' Compensation Court found Killoy's description of his pain credible.  To suggest that, in light of the combined testimony of

24

Dr. Dewey and Killoy, and the Workers' Compensation Court's finding that Killoy was credible, there is no evidence of total disability defies common sense.

For these reasons, I conclude that Killoy proved his entitlement to permanent total disability benefits by a preponderance of the evidence and that there was not substantial evidence to support the Workers' Compensation Court's denial of those benefits.

I concur with the majority opinion.

_____
Justice

Justice Karla M. Gray, dissenting.

I respectfully dissent from the Court's opinion for the same reason I recently dissented from part of the Court's opinion in Larson v. CIGNA Ins. Co. (Mont. 1996), 915 P.2d 863, 53 St.Rep. 394. It is my view that the Court again misapplies our stated standard for reviewing the Workers' Compensation Court's findings of fact and I cannot join the Court in doing so.

The Workers' Compensation Court's ultimate finding in this case is that Killoy has a reasonable prospect of physically performing regular employment and, therefore, that he did not meet his burden of proving permanent total disability by a preponderance of the evidence. Our standard in reviewing that finding is to determine whether substantial credible evidence supports it. Wunderlich v. Lumbermens Mut. Cas. Co. (1995), 270 Mont. 404, 408, 892 P.2d 563, 566. Our standard is not, as we have stated clearly and repeatedly, whether evidence supports a finding different from that made by the Workers' Compensation Court. See, e.g., Wilson v. Liberty Mut. Fire Ins. (1995), 273 Mont. 313, 903 P.2d 785. It is my view that a proper application of our standard of review mandates a conclusion that substantial credible evidence supports the Workers' Compensation Court's finding.

Substantial evidence is "more than a mere scintilla of evidence but may be less than a preponderance of the evidence." Taylor v. State Compensation Ins. Fund (Mont. 1996), 913 P.2d 1242, 1245, 53 St.Rep. 201, 202 (citation omitted). With regard to the Workers' Compensation Court's finding that Killoy has a reasonable prospect of physically performing regular employment, the record

26

reflects the following. A certified rehabilitation counselor identified numerous jobs, generally available on both full- and part-time bases, as possibly suitable for Killoy. On that basis, she testified that Killoy has a reasonable opportunity for regular employment. Dr. Dewey opined that Killoy could safely attempt all but one of those jobs without risk to his physical condition; he did not opine that Killoy's pain would render him incapable of performing the jobs.

Killoy described his pain as constant, but testified that his "bad days" occur once or twice a week and that he seeks relief via hot showers and a heating pad. His pain is aggravated by both increased activity and remaining stationary for any length of time. Killoy spends a typical day reading, walking, watering his lawn and watching television. He is able to drive, mow his lawn, and participate in limited outdoor recreational activities.

Killoy does not believe he could perform any of the identified jobs which Dr. Dewey opined he could safely attempt because of his pain. He has neither worked nor attempted to work or find employment since his re-injury in February of 1994, and he testified that he does not want to work at a minimum wage job.

Based on Killoy's testimony as to substantial difficulties in lifting his hands over his head, being required to stand for 85% of a work shift, lifting and carrying up to 15 pounds continuously and extensive physical activity, the Workers' Compensation Court determined that Killoy was unable to perform three of the identified positions because they would increase his pain beyond what he could reasonably endure. Accepting Killoy's complaints of pain, the court found that Killoy could perform the jobs of cashier

or motel clerk on a full-time or part-time basis.

This record clearly contains substantial credible evidence supporting the Workers' Compensation Court's finding that Killoy has a reasonable prospect of physically performing regular employment. He is physically capable of standing, sitting, walking, driving a vehicle, mowing his lawn and engaging in recreational pursuits. Positions involving these, or **similar,** activities were identified. Nor was any medical opinion testimony presented that Killoy was incapable of performing these jobs because of either physical limitations or pain considerations.

The Court makes much of our conclusions in <u>Robins</u> and <u>Jensen</u> that pain must be considered as a factor in determining disability. It is clear, however, and even this Court does not suggest otherwise, that the Workers' Compensation Court did consider the pain-related evidence of record. Nothing in <u>Robins</u> or <u>Jensen</u> supports this Court's implicit conclusion regarding those cases that a claimant's bare assertion of belief that he cannot tolerate the pain associated with working mandates a determination that he is entitled to permanent total disability benefits. Moreover, in those cases, the Workers' Compensation Court found that the claimants <u>were </u>permanently totally disabled. What the Court fails to recognize here is that, in both <u>Robins</u> and <u>Jensen</u>, we discharged our duty of determining whether substantial evidence <u>supported</u> the trial court's findings of permanent total disability by recognizing the pain-related evidence which supported those findings. We are in the converse situation here and, as noted above, it is <u>not</u> our duty to determine whether evidence supports findings contrary to those made by the Workers' Compensation Court. <u>See</u> <u>Wilson,</u> 903

28

P.2d at 788.

In addition, § 39-71-702(2), MCA (1993), requires that a "determination of permanent total disability must be supported by a preponderance of medical evidence." The Court does not address this statutory requirement at all.

The record is clear, however, that Killoy offered no medical evidence that he did not have a reasonable prospect of physically performing regular employment. No doctor advanced a medical opinion that Killoy was physically incapable of performing regular employment. Indeed, Dr. Dewey approved five positions for Killoy to the extent that his performance of those positions would not harm, or risk, his physical condition. Dr. Dewey did not opine that Killoy's pain rendered him unable to perform the positions and, therefore, the Court's reliance on our ability to determine the weight of medical deposition testimony, under Caekaert, is totally misplaced; there is simply no medical evidence of pain too severe to permit the performance of regular employment. Dr. Dewey merely deferred to Killoy's judgment on that question and Killoy testified that he believed his pain was too great to work through. Killoy's subjective view of his pain does not constitute medical evidence.

Moreover, any suggestion that questions relating to the extent of a person's pain, or the person's ability to tolerate the pain while working, are not medical issues would be problematic with regard to the Court's opinion in this case. For example, such a suggestion would appear to mean that the requirement contained in § 39-71-702(2), MCA (1993), that permanent total disability be established by a "preponderance of medical evidence" could never be

29

met and, therefore, a claimant could never meet the statutory criteria and could never establish entitlement to permanent total disability benefits regardless of the extent of his or her pain and the clear impossibility of working while experiencing it. Such a result would be anathema to us all.

In addition, it should be noted in this regard that the doctor in <u>Robins</u> testified to his opinion that the claimant could not return to his previous position because of the pain that accompanied working. <u>Robins,</u> 575 P.2d at 71. If that doctor could give such a medical opinion, why cannot other doctors do so--either for or against the proposition? The <u>Robins</u> medical testimony would seem to belie any notion that pain is not a medical question. Yet the Court's failure to address § 39-71-702(2), MCA (1993), in any fashion leaves these problems unresolved.

Finally, it is appropriate to comment briefly on portions of the special concurring opinion in this case. I do not disagree in any way with that opinion's statement of this Court's standard in reviewing medical deposition testimony. I agree entirely that our usual deference to the trial court's ability to observe the demeanor and, thereby, assess the credibility of witnesses does not and cannot relate to medical evidence given by deposition. I also agree that that standard places "some additional responsibility on the reviewing court to independently analyze and evaluate" medical deposition evidence; I have not been reluctant to do so in other cases or in this case.

It appears, however, that Justice Trieweiler views the medical deposition standard as effectively repealing our overriding standard of determining whether substantial evidence supports the

30

Workers' Compensation Court's findings and replacing it with a standard that allows us to choose bits and pieces of such evidence as might support findings contrary to those made by the trier of fact. I do not agree. As stated in one of the recent cases discussing the medical deposition standard which is cited in the special concurring opinion,

> [t]his de novo standard of review does not extend to a review of the entirety of the case and the overall decision. Medical testimony must be harmonized with and considered in the context of the evidence as a whole. The substantial credible evidence standard controls the analysis of the record as a whole.

White v. Ford, Bacon & Davis Texas, Inc. (1992), 256 Mont. 9, 13, 843 P.2d 787, 789 (citation omitted). We have reiterated that standard on numerous occasions, most recently in Wilson on September 26, 1995. See Wilson, 903 P.2d at 787-88. Clearly, this limited de novo review standard does not allow, and was never intended to allow, this Court to merely substitute its judgment for that of the Workers' Compensation Court on questions of fact.

Moreover, it is my view that the special concurring opinion mischaracterizes or overreads the portions of Drs. Knutson's and Dewey's 1994 reports it cites. Dr. Knutson states that "I suspect Mr. Killoy will be disabled from his laboring type of profession. . . ." Similarly, Dr. Dewey opines that Killoy "could not return to his usual [heavy labor] occupation with Rhone Poulene [sic] but could return to a lighter occupation if that can be worked out. If not, I think he should be medically retired. ." These reports support the uncontroverted and undisputed reality that Killoy cannot perform the duties of his earlier position as a heavy-duty mechanic for Rhone-Poulenc; they also support the proposition that

31

Killoy cannot perform heavy labor jobs of any kind. They do not, however, support or mandate a determination that Killoy "does not have a reasonable prospect of physically performing regular employment" as required by the statutory definition of permanent total disability. See § 39-71-116(19), MCA (1993).

Under the Court's decision in this case, a claimant such as Killoy can establish entitlement to permanent total disability benefits, as a matter of law, on the sole basis of his subjective assertion that he cannot tolerate working at any job because of the pain he experiences. Physical incapacity to perform is not required; a good-faith effort--indeed, any effort--is not required; a supporting medical opinion is not required. I cannot agree with the Court's displacement of the statutory definition of permanent total disability, the claimant's burden of proof, the proper role of the Workers' Compensation Court as the trier of fact and our standards in reviewing that court's findings.

I dissent.

_____
Justice

Chief Justice J. A. Turnage and Justice Charles E. Erdmann join in the foregoing dissent of Justice Karla M. Gray.

_____
Chief Justice

_____
Justice