FILED

December 23 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0171

DA 14-0171

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 336

---

JIM BATES,

      Petitioner and Appellant,

  v.

LAURA LEE NEVA,

      Respondent and Appellee.

---

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-Second Judicial District, In and For the County of Stillwater, Cause No. DV 12-39 Honorable Brenda Gilbert, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Jim Bates, self-represented, Fishtail, Montana

      For Appellee:

          Patricia D. Peterman; Michael F. McGuinness, Patten, Peterman, Bekkedahl & Green, PLLC, Billings, Montana

---

      Submitted on Briefs: December 12, 2014
             Decided: December 23, 2014

Filed:

_____
              Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1　　Jim Bates appeals the Twenty-Second Judicial District Court's ruling that the Montana Human Rights Act (MHRA) applies to Laura Lee Neva's claim of sexual harassment in her lease of commercial property from Bates. The issue we address on appeal is whether the MHRA applies to Neva's commercial lease. We conclude that it does and affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2　　In June 2009, Neva approached Bates about leasing a commercial property in Absarokee for an art gallery. The building was not immediately tenantable because it had a leaky roof and other problems. The two came to a verbal agreement: Bates would pay for the materials and make the repairs, while Neva would help with the repairs and would not pay rent until a month after the building's condition permitted the gallery to open for business.

¶3　　In July 2009, the two worked together on the repairs. Neva would later testify to numerous instances of inappropriate conduct by Bates during this month, including grabbing Neva's breast, commenting on Neva's underwear, and telephoning Neva to tell her that he was naked. Bates also sent a string of emails to Neva, later admitted into evidence, in which he proposed sexually explicit encounters. Neva eventually told Bates that he was "nothing but a landlord" to her. Bates then stopped making repairs, though the two dispute whether that was because Neva rebuffed his advances or because Neva

2

installed a security system preventing Bates from gaining unfettered access to the building.

¶4     In 2010, Neva filed a complaint with the Montana Human Rights Bureau, alleging that Bates violated the MHRA by sexually harassing her. In 2011, after a contested hearing, a hearing officer found that Bates had "severe[ly]" and "persistent[ly]" harassed Neva, and that the harassment was "patently unwelcome." Despite these findings, the hearing officer concluded that the harassment occurred in a context that neither the MHRA's public accommodation nor real estate provisions cover. With regard to the MHRA's real estate provisions, the hearing officer declared, "The MHRA does not address illegal discrimination in commercial, as opposed to housing, leases between private individuals."

¶5     Neva appealed the hearing officer's determination to the Montana Human Rights Commission. Examining the text of the MHRA, the Commission concluded that it "prohibits unlawful discrimination in commercial property transactions, as well as all other real estate transactions." Accordingly, the Commission ruled that Neva could proceed with her claim.

¶6     Bates sought judicial review, arguing that the Commission: (1) violated his right to due process by analyzing Neva's action under the MHRA's real estate provisions, and (2) incorrectly interpreted those provisions. Ruling for Bates on the due process argument, the District Court vacated the Commission's decision and reinstated the hearing officer's.

3

¶7      Neva appealed the District Court's order to this Court and we reversed, concluding that Bates received due process. *Bates v. Neva*, 2013 MT 246, ¶¶ 19-20, 371 Mont. 466, 308 P.3d 114. We remanded, directing the District Court to resolve the issue that formed the alternate basis for Bates's challenge to the Commission's decision: whether the MHRA's real estate provisions apply to Neva's commercial lease. *Bates*, ¶ 20.

¶8      On remand, the District Court concluded that the MHRA's real estate provisions prohibit discrimination in commercial real estate transactions. The court entered an order on February 27, 2014, remanding the case to the Montana Department of Labor and Industry's Hearings Bureau for further proceedings, including a determination of damages. Bates appeals the District Court's decision and order, thus presenting to the Court this matter of first impression.

## STANDARD OF REVIEW

¶9      The correct interpretation of a statute is a question of law that we review de novo. *City of Missoula v. Iosefo*, 2014 MT 209, ¶ 8, 376 Mont. 161, 330 P.3d 1180.

## DISCUSSION

¶10     The MHRA prohibits an "owner, lessor, or manager" leasing a "housing accommodation or improved or unimproved property" from discriminating on the basis of sex "in a term, condition, or privilege" relating to property's "use" or "lease." Section 49-2-305(1), (1)(b), MCA. "[S]exual harassment is sexual discrimination under the [MHRA]." *Harrison v. Chance*, 244 Mont. 215, 221, 797 P.2d 200, 204 (1990).

¶11     Based on the plain meaning of improved or unimproved property as used in § 49-2-305(1), MCA, the District Court concluded that the MHRA prohibits

4

discrimination in commercial real estate transactions. The court posited that a plain reading of the statute yields three categories of real estate transactions in which discrimination is prohibited: (1) housing accommodation transactions, (2) improved property transactions, and (3) unimproved property transactions. The court noted that only a "strained" reading of the statute would support reading "housing," which clearly modifies "accommodation," as also modifying "improved property or unimproved property." The court further pointed out that, if improved property meant housing property, it would mean essentially the same things as a housing accommodation. Thus, the court concluded that under "approved usage of language, 'improved property' includes commercial improved property, as there is no provision limiting it to residential improved property."

¶12 Bates argues that the District Court got it wrong. Specifically, he interprets "housing accommodation or improved or unimproved property" to mean "housing accommodation or housing property." This interpretation, he suggests, reflects the Legislature's intention to make the MHRA equivalent to the Federal Fair Housing Act with regard to real estate transactions. He argues that this interpretation also better comports with § 49-2-305's title, which refers to discrimination in housing, and with its other subsections that reference housing. Further, he suggests that his interpretation gives proper weight to how the Montana Human Rights Bureau, charged with administering the MHRA, applied § 49-2-305, MCA, only in housing transactions until it did otherwise in this case. Finally, he argues that his interpretation gives meaning to all of the statute's

5

words because a housing property includes vacant housing whereas a housing accommodation does not.

¶13 We interpret statutes consistently with the Legislature's intent as crystallized in the statute's plain language. *In re Marriage of Rudolf*, 2007 MT 178, ¶ 41, 338 Mont. 226, 164 P.3d 907. Specifically, in interpreting a statute, we are "simply to ascertain and declare what is in the terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. It is not our prerogative to read into a statute what is not there. *Rudolf*, ¶ 41. As the District Court pointed out, to determine whether the MHRA applies to Neva's lease, one must ascertain the meaning of at least two terms: "housing accommodation" and "improved or unimproved property." "Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA.

¶14 First enacted in 1974, the MHRA recognizes and declares that "[t]he right to be free from discrimination because of race, creed, religion, color, sex, physical or mental disability, age, or national origin" is a "civil right." Section 49-1-102(1), MCA. The MHRA prohibits discrimination in a number of circumstances, including real estate transactions:

> (1) It is an unlawful discriminatory practice for the owner, lessor, or manager having the right to sell, lease, or rent a *housing accommodation or improved or unimproved property* or for any other person:
>
> .   .   .

6

(b) to discriminate against a person because of sex, marital status, race, creed, religion, age, familial status, physical or mental disability, color, or national origin in a term, condition, or privilege relating to the use, sale, lease, or rental of the housing accommodation or property . . . .

Section 49-2-305(1), MCA (emphasis supplied). The MHRA defines housing accommodation as "a building or portion of a building, whether constructed or to be constructed, that is or will be used as the sleeping quarters of its occupants." Section 49-2-101(14), MCA.

¶15 The MHRA does not define improved or unimproved property. "When the legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning." *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666. In ascertaining plain meaning, we have "long adhered to 'ordinary rules of grammar.'" *Thompson v. J.C. Billion, Inc.*, 2013 MT 20, ¶ 22 n. 5, 368 Mont. 299, 294 P.3d 397 (quoting *Jay v. Sch. Dist. No. 1 of Cascade Cnty.*, 24 Mont. 219, 225, 61 P. 250, 252 (1900)).

¶16 Bates argues that, in the phrase "housing accommodation or improved or unimproved property," improved or unimproved property is limited to housing property. But that construction requires reading "housing" as modifying improved or unimproved property. Plain language and proper usage of grammar militate against that reading. Specifically, the series-qualifier canon of statutory interpretation, which calls for reading a pre-positive modifier as modifying all items that follow in a series, applies only where the items in the series have parallel construction. *Black's Law Dictionary* 1574 (Bryan A. Garner ed., 10th ed. 2009). If the items do not have parallel construction because a

modifier is interspersed between them, the result is that the pre-positive modifier applies only to the first item in the series and does not carry over. *Ward Gen. Ins. Servs., Inc. v. Emp'rs Fire Ins. Co.*, 7 Cal. Rptr. 3d 844, 849 (Cal. Ct. App. 2003) ("Most readers expect the first adjective in a series of nouns or phrases to modify each noun or phrase in the following series *unless another adjective appears*." (emphasis supplied)); Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 148 (2012) ("The typical way in which syntax would suggest no carryover modification is that a determiner . . . will be repeated before the second element.").  To illustrate, the phrase "skinny men or happy or sad women" is syntactically identical to "housing accommodation or improved or unimproved property."  But no reasonable reader would read "skinny" to modify "happy or sad women."  Instead, a reasonable reader would read "skinny" as modifying only "men" and "happy or sad" as the sole modifiers of "women." Likewise, because we adhere to "the ordinary rules of grammar," *Jay*, 24 Mont. at 225, 61 P. at 252, we read "housing" to modify "accommodation" and not "improved or unimproved property."[1]

¶17    The MHRA's definition section confirms that "housing accommodation" and "improved or unimproved property" are separate and distinct terms.  As noted, the statute defines housing accommodation, § 49-2-101(15), MCA, but not improved or unimproved property.  The phrase "housing accommodation and improved or unimproved property" is

---

[1]  Bates might have a stronger argument if we were interpreting the phrase "housing accommodation or property, whether improved or unimproved."  The word "housing" then might be susceptible to an interpretation that it modifies "property."  But that is not the language that we interpret today.

8

thus split, with only the first term in the phrase having been given a specific definition to be applied to the exclusion of the term's plain and ordinary meaning. Reading "improved or unimproved property" as dependent on "housing" contravenes the separation the Legislature created.

¶18 Reading improved or unimproved property as dependent on "housing" also contravenes our obligation to, if possible, "give effect to all" words in a statute. Section 1-2-101, MCA; *Mont. Trout Unlimited v. Mont. Dep't of Nat'l Res. & Conservation*, 2006 MT 72, ¶ 23, 331 Mont. 483, 133 P.3d 224 ("We must endeavor to avoid a statutory construction that renders any section of the statute superfluous or fails to give effect to all the words used."). Bates argues that improved or unimproved property, as modified by "housing," is different from a housing accommodation because improved or unimproved property accounts for vacant housing land, whereas a housing accommodation does not. But the definition of housing accommodation specifies that the term applies not just to housing that is constructed and in which someone resides, but also to housing "to be constructed," and buildings that "will be used as sleeping quarters" even if not currently used as such. Section 49-2-101(15), MCA. If improved or unimproved property is read simply to refer to vacant housing, the term will add nothing to the statute that is not already included in "housing accommodation."

¶19 We need not contrive a specialized meaning for improved or unimproved property because the plain and ordinary meaning of this phrase gives it a separate meaning from a housing accommodation. Improved property is a commonly-used term to refer to land with a structure on it. *Black's Law Dictionary* 1008 (defining "improved land" as "[l]and

9

that has been developed; esp., land occupied by buildings and structures"); Philip A. Benson & Nelson L. North, *Real Estate Principles and Practices* 48 (1924) ("A purchaser in offering to buy improved property is always presumed to be intending to purchase three things: 1. the land, 2. the structure, capable of occupancy and rentable, and 3. the right to maintain it."). Unimproved property corresponds as land without a visible structure on it. *Black's Law Dictionary* 1009 (defining "unimproved land" as "[r]aw land that has never been developed, and usu. that lacks utilities" or "[l]and that was formerly developed but has now been cleared of all buildings and structures."). The separation of housing accommodation from improved or unimproved property by the disjunctive "or" suggests that improved or unimproved property refers to types of real estate that a housing accommodation does not. Interpreting improved or unimproved property to include commercial real estate gives effect to all the statute's words.

¶20 Bates questions this plain reading by pointing out that § 49-2-305, MCA, refers many times to housing and ideas related to housing, but never explicitly mentions commercial real estate. This argument overlooks that most of § 49-2-305's references to "housing" are within the phrase "housing accommodation *or* property" that is echoed throughout the statute and that plainly refers back to the phrase "housing accommodation or improved or unimproved property" in § 49-2-305(1), MCA. *See, e.g.*, §§ 49-2-305(1)(a), (1)(b), (1)(c), MCA (emphasis supplied). This argument further overlooks that where the Legislature has added specific housing or residential limiting language, it has been to address particular housing issues such as housing for the

10

disabled, § 49-2-305(5)-(6), MCA, and the financing, selling, or appraising of residential real property, § 49-2-305(7), MCA.

¶21   Bates also calls our attention to § 49-2-305's title in the Montana code ("Discrimination in housing – exemptions") to suggest that the title reveals the Legislature's intent.  But "unless specifically and expressly adopted as part of the law by the legislature . . . catchlines, or other editorial material included in the Montana Code Annotated may not be construed as part of the legislative text but are only for the purpose of convenience, orderly arrangement, and information."  Section 1-11-103(5), MCA. Titles in the code are subordinate to statutory text and cannot be used to create ambiguity. *Manufacturers Acceptance Corp. v. Krsul*, 151 Mont. 28, 35, 438 P.2d 667, 672 (1968); *State ex rel. Palagi v. Regan*, 113 Mont. 343, 351, 126 P.2d 818, 824 (1942).  Thus, barring any evidence that the Legislature specifically adopted § 49-2-305's current title, we will not rely on § 49-2-305's title in the code to call into question the plain meaning of the section's text.  Moreover, the title that the Legislature gave to the MHRA in 1974 was "An Act to Prevent Discrimination in Employment, Public Accommodations, Education, and Real Property Transactions . . ." and, in the original version of the MHRA, the anti-discrimination provisions were combined in one section broadly entitled, "Discriminatory practices described and prohibited."  These titles suggest that the MHRA was not designed to prohibit discrimination in housing transactions alone.

¶22   Bates also points to our recognition that "[t]he Montana Legislature has indicated its clear intent that the MHRA be interpreted consistently with federal discrimination statutes and case law."  *BNSF Ry. Co. v. Feit*, 2012 MT 147, ¶ 8, 365 Mont. 359, 281

11

P.3d 225. Bates suggests that we should read the MHRA as regulating discrimination only in housing because that is all that the Federal Fair Housing Act regulates.

¶23    In *Feit*, we held that obesity may constitute a physical or mental impairment under the MHRA. *Feit*, ¶ 16. In discussing the definition of disability, we stated that the "MHRA [is] to be interpreted consistently with federal discrimination statutes and case law." We specifically noted that "the definition of physical or mental disability [in the MHRA] is substantially identical to that in the [Americans with Disabilities Act]" and that the Legislature in creating that definition in 1991 did so on the premise that the previous disability definitions "lacked clarity and are inconsistent with definitions used in federal civil rights statutes and court interpretations on the subject." *Feit*, ¶ 8.

¶24    In contrast to *Feit*, where the language and history of the statute supported reading the MHRA's disability provisions identically to federal law, the language and history of the statute do not support reading § 49-2-305, MCA, as identical to federal law. Tellingly, with § 49-2-305, MCA, the Legislature did not adopt substantially similar language to the MHRA's federal counterpart. The Federal Fair Housing Act purports to regulate only "dwelling[s]," 42 U.S.C. § 3604, defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence of one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any building, structure, or portion thereof." 42 U.S.C. § 3602(b). Unlike the MHRA section considered in *Feit*, which included a term and definition ("physical or mental impairment") adopted whole cloth from a federal statute, the Legislature in § 49-2-305, MCA, did not employ the federal statute's key term

12

("dwelling") or its definition. Instead, the Legislature used the term "housing accommodation," for which it provided a residential definition, and the separate term "improved or unimproved property," for which it provided no definition. Section 49-2-305(1), MCA. We are bound to construe the Legislature's choice as deliberate.

¶25 Finally, Bates argues that the Montana Human Rights Bureau, the agency charged with administering the MHRA, long has applied the statute only to housing transactions, and we should thus defer to an agency interpretation limiting the MHRA to housing transactions. This argument ignores that the Human Rights Commission in this very case determined that the MHRA is not limited to housing transactions and applies to commercial real estate transactions.[2]

¶26 The purpose of the MHRA is to protect the individual right to be free from discrimination. Section 49-1-102(1), MCA. If a provision in the MHRA is susceptible to more than one plausible construction (Dissent, ¶ 35), then we adopt the construction that provides the intended protection. *See Stokes v. Mont. Thirteenth Jud. Dist. Ct.*, 2011 MT 182, ¶ 15, 361 Mont. 279, 259 P.3d 754 ("In our interpretation of a statute, 'we must view it as a part of a whole statutory scheme and construe it so as to forward the purpose of that scheme.'" (quoting *Wright v. Ace Am. Ins. Co.*, 2011 MT 43, ¶ 24, 359 Mont. 332, 249 P.3d 485)). It is not the Court's role to "insert what has been omitted" and interpret

---

[2] At the end of his brief, Bates argues in a single paragraph that, even if we find that the MHRA regulates discrimination in commercial real estate transactions, we should not apply that holding to this case because Neva's claim was not investigated within the 120 days mandated in § 49-2-504(7)(a), MCA. We do not address issues raised for the first time on appeal. *Stevens v. Novartis Pharms. Corp.*, 2011 MT 282, ¶ 78, 358 Mont. 474, 247 P.3d 244. Although Bates claims in his reply brief that he raised this issue with the District Court and cites to the record as support, following the citation reveals that the issue was not raised.

improved or unimproved property to encompass only housing property, when the plain language of the statute does not supply that restriction. Section 1-2-101, MCA. That role belongs to the Legislature and it may choose to amend the MHRA if it sees fit to do so. *State v. Goebel*, 2001 MT 73, ¶ 23, 305 Mont. 53, 31 P.3d 335 ("[T]o the extent that the statute does not accurately reflect the Legislature's clearly expressed intention, it is appropriate that the Legislature correct the problem, not the courts."). Until then, we hold that improved or unimproved property as used in the MHRA includes commercial real estate; the MHRA thus applies to Neva's commercial lease.

## CONCLUSION

¶27 We affirm the District Court's decision and order. We remand for proceedings consistent with the District Court's February 27, 2014 order.


/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT


Jutsice Jim Rice, dissenting.

¶28 The Court has read into § 49-2-305, MCA, an expansive and altogether new application of the statute that the Legislature did not provide and the agency has never sought to enforce. In my view, the Court eschews critical canons of statutory construction in favor of focusing on an isolated phrase and analyzing its syntax. Further,

14

the Court errs in its interpretation of the plain language of the statute. I thus disagree with the Court's conclusion that the MHRA "applies to Neva's commercial lease." Opinion, ¶¶ 1, 26.

¶29 In determining legislative intent, we are to be "mindful of the rules of statutory construction that guide our review. . . ." *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426. "'Statutory construction is a "holistic endeavor" and must account for the statute's text, language, structure, and object.'" *Heath*, ¶ 24 (quoting *S.L.H. v. State Compen. Mut. Ins. Fund*, 2000 MT 362, ¶ 16, 303 Mont. 364, 15 P.3d 948, quoting *United States Nat'l Bank v. Independent Ins. Agents of Am.* (1993), 508 U.S. 439, 455, 113 S. Ct. 2173, 2182, 124 L. Ed. 2d. 402, 418). In this holistic endeavor, we must avoid a myopic focus: "When construing a statute, it must be read as a whole, and its terms should not be isolated from the context in which they were used by the Legislature." *State v. Price*, 2002 MT 229, ¶ 47, 311 Mont. 439, 57 P.3d 42; *see also Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003 ("We construe a statute by reading and interpreting the statute as a whole, 'without isolating specific terms from the context in which they are used by the Legislature.'") (citation omitted).

¶30 A reading of the anti-discrimination provisions within § 49-2-305, MCA, reveals, first, that there is not a single word, term or clause of a specifically commercial nature in the entire provision. There is no expression of commercial applicability to which the Court's rendering of "improved or unimproved property" may correspond. Rather, § 49-2-305, MCA, is saturated with terms related to housing, such as "residential real estate-related transactions" (§ 49-2-305(7)), "private residence" (§ 49-2-305(2)),

15

"sleeping rooms," (§ 49-2-305(2)), "sleeping quarters" (§ 49-2-101(14)), "single-family occupancy," (§ 49-2-305(2)), "multifamily housing" (§ 49-2-305(6)), "dwelling units" (§ 49-2-305(6)), "dwellings" (§ 49-2-305(11)), "residence" (§ 49-2-305(11)), "living quarters" (§ 49-2-305(11)), "residing in" (§ 49-2-305(4)), "familial status" (§§ 49-2-305(10), (11), (12)), "families" (§ 49-2-305(11)), and "neighborhood" (§ 49-2-305(1)(f)). These terms are in addition to the term "housing" itself, which is used *24 times* within the section, including the sub-category of housing, "Housing for older persons" (§ 49-2-305(10)).

¶31 As they were when originally enacted in 1974, the anti-discrimination provisions of the MHRA are organized into sections by type of discrimination. Those sections have been labeled in the Montana Code Annotated for ease of understanding, including, for example, "49-2-303. Discrimination in employment," "49-2-304. Discrimination in public accommodations," "49-2-306. Discrimination in financing and credit transactions," and "49-2-307. Discrimination in education." Likewise, the section at issue here is labeled "49-2-305. Discrimination in housing—exemptions." The identification of the section's content as "discrimination in housing" corresponds both to the abundance of residential language and absence of any commercial language within the section. The Court correctly notes that these catchlines were not enacted by the Legislature. Opinion, ¶ 21. However, it cannot be denied, from a review of their content, that the anti-discrimination sections of the MHRA are organized precisely as they have been labeled, and that, consistent with its catchline, the subject of § 49-2-305, MCA, is

16

housing discrimination, because it contains extensive provisions related to housing discrimination, and no specifically commercial language.[1]

¶32 Bates correctly notes that the phrase, "housing accommodation or improved or unimproved property," is used only once, while the phrase "housing accommodation or property" is frequently used within § 49-2-305, MCA, thereafter. But there is more to this point. Following the initial reference within -305(1) to "*a* housing accommodation or improved or unimproved property," the accommodation is thereafter commonly referred to as "*the* housing accommodation or property." *See* § 49-2-305(1)(a) (it is unlawful to refuse to "sell, lease, or rent *the housing accommodation or property* to a person because of sex, marital status, race, creed, religion. . . ."). This subsequent phrasing is an apparent reference to the initial wording used in -305(1), and indicates that a single accommodation concept is intended for the entire section—one premised on housing. In fact, had the Court properly analyzed the language of the phrase "housing accommodation or improved or unimproved property" within § 49-2-305(1), MCA, it would have reached the same conclusion as a matter of plain language.

¶33 The Court rejects Bates' interpretation of "improved and unimproved property" as referring to vacant land because, as the Court sees it, the term "housing accommodation" encompasses vacant land because it includes buildings "to be constructed," and therefore, Bates' interpretation of the phrase would add nothing to the statute. Opinion, ¶ 18.

---

[1] *See also* § 49-2-510, MCA, which is labeled "Procedures and remedies for enforcement of housing discrimination." This provision sets forth the procedure to be used by a "person claiming to be aggrieved by any discriminatory practice prohibited by 49-2-305." Section 49-2-510(1), MCA.

However, the Court's interpretation distorts the plain wording of the statute. "Housing accommodation" is specifically defined by § 49-2-101(14), MCA, to mean buildings only, whether already constructed or to be constructed. The fact that the term applies to buildings that will be constructed in the future does not somehow make the term applicable to vacant land on which no building will be constructed. Clearly, the term "improved and unimproved property" adds to the statute's coverage those consumer housing options that do not require a building, for example: rental of land that has improvements, such as a mobile home park with sewer hook-ups ("improved property"); and rental of raw land with no improvements, such as campgrounds or other locations without any services, intended for self-contained housing units, such as motor homes ("unimproved property").[2] Without the phrase "improved and unimproved property," these other housing options would not be covered by the statute. Thus, under the definitions provided by the Legislature, "housing accommodation or improved or unimproved property" covers all of the housing options available to a consumer, building and non-building, and does not require application of the phrase to commercial leases in order to give it meaning. Indeed, the statute defines "*residential* real estate transaction" as those including "purchasing, constructing, improving, repairing, or maintaining a *housing accommodation or property*." Section 49-2-305(7)(b)(i)(A), MCA (emphasis added). Thus, both the term "housing accommodation" and the term "property" are

---

[2] A ballooning use of this arrangement can be seen in some of the ubiquitous "man camps" in the oil fields.

defined by the statute to be residential in nature. *See also* § 49-2-305(4), MCA ("*residing in . . .* the housing accommodation or property") (emphasis added).

¶34 It is obvious that, for these reasons, the agency has interpreted this section, since its enactment, as applying only to housing discrimination claims. Administrative Rule of Montana 24.8.207, states, in part:

> (1) Within ten business days of the filing of the complaint, the Human Rights Bureau shall serve notice of filing upon the parties by mail. The notice shall:
>
> .  .  .
>
> (d) *in cases filed pursuant to 49-2-305, MCA (housing cases)*, advise the parties of their right to commence a civil action under 49-2-510(4)(a), MCA, in an appropriate district court. . . .

Admin. R. M. 24.8.207 (2008) (Notice of Filing Complaints (emphasis added)). As the Hearing Officer noted, "[t]he MHRA does not address discrimination in commercial, as opposed to housing, leases between private individuals." We follow the rule that "where a particular meaning has been ascribed to a statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance," such interpretation is entitled to "respectful consideration." *Mont. Power Co. v. Mont. PSC*, 2001 MT 102, ¶ 25, 305 Mont. 260, 26 P.3d 91 (citation omitted).

¶35 All that said, even if the Court's gramatical analysis has correctly determined that commercial leases could be included within the phrase "housing accommodation or improved or unimproved property," this presents a classic example of the rare case when the Court's proper duty nonetheless requires reversal of the District Court. As the U.S. Supreme Court has explained:

19

It is a familiar rule that *a thing may be within the letter of the statute and yet not within the statute*, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, *words broad enough to include an act in question, and yet a consideration of the whole legislation*, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such a broad meaning to the words, *makes it unreasonable to believe that the legislator intended to include the particular act*.

*Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S. Ct. 511, 512, 36 L. Ed. 226, 228 (1892); *see also Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454, 109 S. Ct. 2558, 2567, 105 L. Ed. 2d. 377, 397 (1989) (citing *Church of the Holy Trinity*); *Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2008 MT 377, ¶ 72, 346 Mont. 507, 198 P.3d 219 (declining to apply the statutory term "natural water body" in its literal sense where such an application would be contrary to the Stream Access Act). Here, "a consideration of the whole legislation," or, in terms used by our jurisprudence, a consideration of "the statute's text, language, structure, and object," makes it abundantly clear to me that the Legislature intended § 49-2-305, MCA, to apply only to housing discrimination, and not to commercial leases. That intention should be enforced regardless of the unusual syntax used by the drafters.

¶36    I would reverse.

/S/ JIM RICE

Justice Laurie McKinnon joins in the Dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON

20